## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CECELIA ANN JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3177 |
| | ) | |
| ANDREW SAUL, Commissioner | ) | |
| of Social Security, [1] | ) | |
| | ) | |
| Defendant. | ) | |

## **REPORT AND RECOMMENDATION**

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Cecelia Ann Johnson appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Johnson filed her application for Disability Benefits on October 30, 2012.  She alleged that she became disabled on November 20, 2009 (Onset Date).  She was insured for Disability Benefits through December 31, 2013 (Date Last Insured).  The Commissioner's initial decision to deny her application became final on June 13, 2016.  Certified Transcript of Proceedings before

---

[1] Andrew Saul is now the Commissioner of Social Security.  He is automatically substituted in as the proper party Defendant in this case.  Fed. R. Civ. P. 25(d).

the Social Security Administration (d/e 11, 12, and 13) (R.), at 6, 17-26, 1280.  Johnson appealed the decision to this Court.  This Court reversed and remanded pursuant to the parties' joint motion to remand.  Johnson v. Berryhill, C. D. Ill. Case No. 16-3256 (First Judicial Review Action), Opinion entered June 13, 2017 (Case No. 16-3256 d/e 16), a copy of which is included in the record at R. 1388-89.  On remand, the Defendant Commissioner again denied Johnson's application for Disability Benefits.  Johnson now appeals that denial of benefits.  Johnson filed a Motion for Summary Judgment or Remand (d/e 18).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 21).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

### Evidence Prior to First Evidentiary Hearing

Johnson was born on February 28, 1964. Johnson has a bachelor's degree.  She previously worked as a retail cashier-checker and office manager.  Through her Date Last Insured, Johnson suffered from the severe impairments of spine disorder with lumbosacral radiculopathy, diabetes, coronary artery disease, hypertension, nephrolithiasis, status-

post carpal tunnel release, obesity, and affective disorder.  R. 36-38, 1280, 1288.

On August 31, 2009, Cecelia Johnson saw Dr. Ferdinand Salvacion, M.D., for a pain consultation.  R. 779-80.  Johnson reported a recurrence of back pain and pain down her left leg.  Dr. Salvacion noted that Johnson received a series of epidural steroid injections earlier in 2009 with good results.  She reported that her pain flared up when she was involved in an automobile accident.  On examination, Johnson had tenderness to palpation in her lumbar paraspinal musculature, diminished sensation in her right lower leg, and a positive right straight leg test.  R. 779.  Dr. Salvacion assessed lumbar degenerative disc disease and lumbar radiculopathy.  Dr. Salvacion recommended another trial of lumbar epidural steroid injections.  R. 779.

On October 7, 2009, Johnson saw cardiologist Dr. Stephen Mayer, M.D., for a follow up of multivessel coronary disease.  In 2000, Johnson had two stents placed into coronary blood vessels.  In 2006, she had three additional stents placed into coronary blood vessels.  R. 275.  Johnson reported no chest pain, syncope, or presyncope.  She reported chronic dyspnea on exertion.  She was on a diuretic for mild edema.  R. 279.  On examination, Johnson was 64 inches tall, weighed 276 pounds, and had a

Body Mass Index (BMI) of 47.50.  R. 281.  Dr. Mayer directed her to return in a year for a follow up.  R. 282.

On November 30, 2009, Johnson saw Dr. Salvacion for back pain. Johnson rated her pain as more than an 8 out of 10.  R. 753.  Dr. Salvacion administered a lumbar epidural steroid injection.  R. 751.

On December 17, 2009, Johnson had an MRI of her lumbar spine.  R. 1261.  The MRI was compared to an earlier MRI.[2]  The MRI showed a central disc herniation at L1-L2, moderate diffuse disc bulge that was stable at L2 L3, a moderate diffuse disc bulge at L4-L5, and a mild diffuse disc bulge at L5-S1.  The Impression and Summary portions of the report stated:

> Impression.  Increased size of disc herniation at L1-L2 increased spinal stenosis with increasing left foraminal narrowing.  Multilevel degenerative disc disease which generally appears stable at other levels as described above.
>
> The intervertebral discs maintain normal signal intensity and height at all levels.  No disc herniation, central stenosis or foraminal narrowing identified.
>
> SUMMARY—MRI LUMBAR SPINE:  No abnormality noted.  No central canal stenosis or disk herniation identified at any level. Stable lipoma of the filum.

R. 1261.

---

[2] The copy of this page in the record is not very legible.  The prior MRI could have been November 30, 2007 or November 30, 2009.  The copy is not clear.

On January 14, 2010, Dr. Chris Wottawa, M.D., performed right carpal tunnel release and right fourth trigger release surgery on Johnson. The surgery was completed without complications.  R. 504-05.  Johnson previously had left carpal tunnel release trigger thumb release surgery. R. 371-72.

On March 10, 2010, Johnson saw Dr. Wottawa for a follow up. Johnson had some pain and stiffness in the fourth finger, but her numbness and tingling were gone.  On examination, Johnson had full range of motion of her fingers.  She had negative Phalen's and Tinel's signs.  Dr. Wottawa released Johnson from his care.  R. 368.

On May 5, 2010, Johnson saw Dr. Salvacion for back and leg pain. Johnson said her pain was returning.  She rated her pain as an 8 out of 10. R. 743.  Johnson said she received good pain relief from injections in the past.  Dr. Salvacion directed Johnson to hold off on taking her Plavix prescription for a week and he would administer a trial of an injection.  R. 740.

On May 18, 2010, Johnson saw Dr. Salvacion.  Dr. Salvacion administered a lumbar epidural steroid injection into Johnson's spine.  R. 732.

On June 30, 2010, Johnson saw Dr. Salvacion.  She rated her pain as a 9 out of 10, and described the pain as located in her lower back and down her left leg.  Dr. Salvacion administered a lumbar epidural steroid injection in Johnson's lumbar spine.  R. 724, 726-27.

On July 28, 2010, Johnson had a CT scan of her abdomen and pelvis.  The scan showed stable nephrolithiasis without ureteral stones nor obstructive uropathy and degenerative disc disease in the lumbar spine.  R. 480, 482.

On September 28, 2010, Johnson had a nerve conduction/EMG study of her back and lower extremities.  The study of Johnson's lower back showed bilateral moderate to severe lumbosacral radiculopathy of nerve roots at L5 and S1; denervation in the L5 and S1 innervated muscles and lumbosacral paraspinal muscles.  The study of Johnson's lower extremities was unremarkable.  R. 703.

On October 22, 2010, Johnson saw Dr. Salvacion.  Dr. Salvacion administered an epidural steroid injection into Johnson's lumbar spine.  R. 710.

On November 2, 2010, Johnson saw advance practice nurse Erin Lock, ANCP-BC, in the Southern Illinois University Healthcare Orthopedics Department.  Johnson saw Lock for a follow up on her low back pain.

Johnson rated her pain at 10/10.  Johnson said her back had been sore for three days.  She said that her pain was better after recent epidural steroid injection.  She said that after the injections she got married and went on a honeymoon.  She said that she went walking during her honeymoon trip and her back pain increased.  She said that the pain radiated to her left knee.  On examination, Johnson had a positive straight leg test.  Her strength was 5/5 in her lower extremities.  Lock assessed degenerative disc disease of the lumbar spine.  Lock scheduled Johnson for two more epidural steroid injections.  R. 701.

On November 11, 2010, Johnson saw Dr. Salvacion for a pain assessment.  She rated her pain at an 8 out of 10.  She said that her pain was concentrated in her lower back and ran down her left leg.  R. 691-92.

On November 19, 2010, Johnson saw cardiologist Dr. Mayer for a follow up.  Johnson complained of back pain and worsening depression. On examination, Johnson was 64 inches tall, weighed 259 pounds, and had a BMI of 44.58.  Dr. Mayer concluded that Johnson was "doing fairly well from a cardiac standpoint and she is on appropriate medication."  He told her to return in a year.  R. 278.

On February 14, 2011, Johnson saw nephrologist Dr. Ashraf Tamizuddin, M.D. for problems related to kidney stones.  Johnson reported

that she had her first kidney stones in 1994. Johnson said that in the last seven years she had four episodes in which she had to undergo procedures to remove kidney stones. Dr. Tamizuddin assessed low-grade proteinuria that could be related to hypertension, diabetes, or prolonged use of NSAID pain relievers. Her renal function was preserved. Dr. Tamizuddin ordered a 24-hour urine for stone panel and microcyte urinalysis. R. 288.

On May 12, 2011, Johnson saw nurse practitioner Susan Nelson, NP, after Johnson passed a kidney stone. R. 330-32. Johnson described the stone as a "pretty good stone." Nelson ordered a CT scan. R. 332.

On May 19, 2011, Johnson had a CT scan of her abdomen and pelvis. The CT scan showed stable non-obstructing renal calculi, coronary artery disease, and mild to moderate hepatic steatosis. R. 478.

On October 20, 2011, Johnson saw Dr. Mayer. Johnson reported that she was without shortness of breath, syncope or presyncope. She said she had rare episodes of sudden chest discomfort. The episodes lasted a couple of seconds and then went away. R. 270. Dr. Mayer reassured Johnson that the pain episodes were not angina. Dr. Mayer saw no reason to change her therapy and told her to come back in a year. R. 273.

On November 21, 2011, Johnson saw nurse practitioner Nelson for a follow up on her nephrolithiasis.  Johnson reported low back pain like her chronic disc pain.  R. 318.  Nelson assessed nephrolithiasis and told Johnson to return in six months.  Johnson wondered whether she would be a candidate for a tens unit like her husband used for back pain.  Nelson told Johnson to follow up with her primary care physician regarding her low back pain.  R. 320.

On January 20, 2012, Johnson had a CT scan of her abdomen and pelvis.  The scan showed non-obstructing renal calculi, thoracolumbar spondylosis with multilevel degenerative disc disease.  R. 476.

On January 21, 2012, Johnson completed a Function Report—Adult form.  R. 193-200.  Johnson said that she could not stand for more than 15 minutes.  She said that she had back and leg pain when standing, sitting, or lying down "all day."  She leaned on a shopping cart to shop.  She said that going up and down stairs was "impossible."  She used either a heating pad or ice "a lot."  R. 193.  Johnson said that in a typical day, she lay on a heating pad for 30 minutes before getting out of bed.  She would get dressed, "do meds & check sugars,"  watch television, and take naps during the day .  She would be "constantly repositioning to help relieve pain."  She said that she helped with cooking.  R. 193-94.  Her husband

and daughter helped with cooking, housework, and taking care of pets.  R. 194.  She prepared simple meals like sandwiches, boxed dinners, and frozen dinners.  She said she prepared dinner four times a week.  She had to sit down every five minutes when she prepared meals.  She sorted laundry for 30 minutes once a week and ran the vacuum cleaner, 30 minutes per room, once every two weeks.  R. 195.  Johnson stated that she could not lift more than five pounds and that she could walk for five to 10 minutes before she had to stop and rest for five to 10 minutes.  She said she could pay attention for 15 to 20 minutes.  R. 198.

On the same day, January 21, 2012, Johnson completed a Physical Impairments Questionnaire.  R. 203.  Johnson reported back pain when lifting over five pounds and extreme fatigue after activity.  She said that she was unsteady when reaching overhead.  She could sit for 30 minutes before she had to get up and move around and she needed two to three rest periods and naps during the day.  R. 203.

On January 30, 2012, Johnson saw nurse practitioner Nelson for a follow up after a recently passed kidney stone.  R. 312-14.  Johnson was feeling better.  She reported that she was in no pain, but still had blood in her urine.  R. 312.  On examination, Johnson was obese, her gait was steady, and she was able to get on and off the exam table with minimal

difficulty.   Nelson assessed nephrolithiasis and hematuria.  R. 314.  Nelson ordered an x-ray of Johnson's abdomen.  The x-ray showed a stable appearing left renal calculus.  The radiologist noted that the x-ray showed degenerative changes of the spine with apparent severe narrowing of the L4-L5 vertebral interspace.  R. 491.

On March 19, 2012, Johnson saw nephrologist Dr. Pradeep Mehta, M.D., for a yearly checkup. Johnson reported that she passed a kidney stone about a month earlier and had pain for about 10 days.  Dr. Mehta's physical examination was normal.  Johnson's kidney function was preserved, and her proteinuria was in the non-nephrotic range.  Dr. Mehta stated that he would continue to monitor her kidney function and protein in her urine.  R. 285.

On April 25, 2012, Johnson had a CT urogram scan.  The scan showed small non-obstructing calculi, small bilateral renal cysts, mild hepatic steatosis, and lumbar spondylosis.  R. 473.

On July 31, 2012, Johnson saw nurse practitioner Stacey Bauman. Johnson reported worsening symptoms of sciatica.  Johnson reported lower extremity pain, low back pain, and paresthesias, but no leg weakness.  On examination, Johnson had an antalgic gait on the left.

Johnson had sciatic tenderness on the left.  Her muscle strength and tone were normal.  Bauman prescribed medication.  R. 531.

On January 21, 2013, Johnson saw nurse practitioner Melanie Reynolds, NP, for low back pain.  R. 514-17.  Johnson said that she could not sit for long periods.  She said she had difficulty bearing weight, and tingling radiating down to her foot and outer leg.  R. 514.  On examination, Johnson was 5 feet 5 inches tall and weighed 245 pounds, with a BMI of 40.82.  Johnson had an abnormal antalgic gait and station.  She had positive straight leg testing.  Reynolds assessed lumbar radiculopathy.  Reynolds prescribed a muscle relaxant and NSAID pain reliever.  R. 516.

On April 10, 2013, state agency physician Dr. Vittal Chapa, M.D., performed a consultative examination of Johnson.  R. 542-49.  Johnson reported that she had a history of heart disease, two herniated discs, diabetes, and chronic kidney stones.  She said that she could not sit or stand for long periods of time.  She had been in an automobile accident.  She said she had back pain for 12 years.  She rated her pain at a 7 out of 10.  She said going up steps was difficult, and she could not walk very far.  On examination, Johnson could ambulate without aids and her gait was normal.  Johnson had 4/5 strength in the left ankle and 5/5 in her other extremities.  Johnson had mild paravertebral muscle spasms.  Her hand

grip was 5/5 and she could perform both fine and gross manipulations. Flexion of her lumbosacral spine was limited. She had full range of motion in her other joints. Straight leg testing was positive on the left side and negative on the right. She had decreased pinprick sensation in the left leg. R. 544-45. Johnson had severe difficulty tandem walking, toe walking, and heel walking. She was unable to squat and arise. She had mild difficulty getting on and off the examination table. R. 549.

On April 18, 2013, state agency psychologist Dr. Howard Tin, Psy.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. R. 61, 64-66. Dr. Tin opined that Johnson had an affective disorder. Her affective disorder caused mild restrictions on activities of daily living; moderate difficulties in maintaining, social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Tin opined that Johnson had not experienced repeated episodes of decompensation, each of extended duration. R. 61. Dr. Tin opined that Johnson's mental impairment caused her to be moderately limited in: maintaining attention and concentration for extended periods; carrying out detailed instructions; working in coordination or proximity to others without being distracted; and interacting appropriately with the general public. R. 64-65. Dr. Tin stated that Johnson "has

difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks."  Dr. Tin opined that Johnson should be limited to "work tasks that do not require interaction with the general public."  Dr. Tin also found that Johnson "has the ability to respond appropriately to changes in work settings, being aware of normal hazards and travel in unfamiliar settings and set realistic goals."  R. 65.

On April 19, 2013, state agency physician Dr. Vidya Madala, M.D., prepared a Physical Residual Function Capacity Assessment of Johnson. R. 62-64.  Dr. Madala opined that Johnson could occasionally lift 20 pounds and frequently lift 10 pounds, sit about six hours in an eight-hour workday, stand and/or walk for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally climb stairs, ramps, ladders, ropes, and scaffolds.  Dr. Madala found no other limitations.  R. 62-64.

On April 30, 2013, Johnson saw Dr. Mulangi Praveen, M.D., for urinary tract infection.  R. 589-92.  Johnson said that she passed a kidney stone in December 2012 and in February 2013.  A urinalysis culture showed infection.  Dr. Praveen prescribed antibiotics.  R. 592.

On August 28, 2013, Johnson underwent a Functional Disability Assessment at Memorial Medical Center in Springfield, Illinois. Physical therapist Valerie Cain conducted the assessment. R.616-28.

Johnson said that her main complaints were low back pain, and left leg pain. She said that her pain ranged from 2/10 to 7/10. She said she had constant low back pain and left thigh pain, intermittent left calf pain. Johnson reported that she had been in two automobile accidents, one in 2001 and the second in 2009. She said that diagnostic imaging showed two herniated discs. She reported sciatica in her left leg for the past 10 years. Johnson said she suffers from hypertension, heart disease with stent placement, depression, back pain, sciatica, high cholesterol, diabetes, kidney problems, and reflux. R. 628.

Johnson was cooperative, but "self-limited" her lifting, carrying, pushing, and pulling. R. 617. The assessment showed she could lift and carry into the sedentary physical demand level, could sit frequently, and could occasionally walk, stand, climb stairs, kneel, crouch, crawl, work overhead, push, and pull. R. 618-21. Johnson's gait was slow with limited push off, a wide base, and increased lateral trunk sway/shift, with limited arm swing. Her fine and gross motor coordination was within normal limits. R. 623. Johnson's range of motion of her spine was within normal limits

except for her lumbar spine. Straight leg testing was negative. R. 624.
Johnson's range of motion of her upper extremities was within functional
limits except for shoulder abduction. Johnson also had decreased strength
with certain motions of her forearm and her shoulders. The range of
motion of Johnson's lower extremities was within functional limits. Johnson
reported increased low back pain with resisted hip flexion and knee
extension. R. 625. Johnson's balance was intact. R. 626. Throughout the
assessment Johnson's movements were smooth, coordinated, and
purposeful. R. 627.

On September 23, 2013, Johnson completed a Function Report—
Adult form. R. 222-29. Johnson said her back pain limited the time she
could stand, sit, or walk. She said she could not lift "hardly any weight." R.
222. Johnson said in a typical day she watched television, napped, tried to
help with dinner and dishes, got on the computer, and let the dogs out as
needed. She did laundry with the help of her daughter. R. 223. Johnson
had no problems with her personal care. She prepared cereal,
sandwiches, and frozen dinners and made daily morning meals. She could
not stand to cook a complete meal. R. 224. Johnson said that she could
lift five pounds, walk ½ block before experiencing pain. She could walk for

10 minutes before she needed to rest for 15 minutes.  She could pay attention for 30 minutes.  R. 227.

On the same day, September 23, 2013, Johnson also completed a Physical Impairments Questionnaire.  R. 231- 232.  Johnson said that she had weakness in her right hand and a numb pinky finger.  She could not write as well as she used to because of back pain and arm pain and weakness.  Reaching overhead was a problem since her heart surgery.  R. 231.  Johnson said that she could sit for 30 minutes due to pain and weakness in her back and legs.  She needed three rest periods of 10 minutes each when doing the dishes.  She needed 15 minutes of rest after walking ½ a block.  R. 232.

On September 26, 2013, Johnson saw Dr. Mayer for a cardiovascular consultation.  R. 605.   Dr. Mayer noted that Johnson had two negative stress tests since she had stents put in her coronary blood vessels.  Johnson reported that she is without pain, shortness of breath, syncope, or presyncope.  Her LDL cholesterol was high.  Dr. Mayer discontinued Johnson's prescription for Plavix since her stents were put in so long ago in 2000 and 2006.  R. 275, 606.  On examination, Johnson was 64 inches tall, weighed 249 pounds, and had a BMI of 42.86.  R. 608.

On October 21, 2013, state agency psychologist Dr. Lionel Hudspeth, Psy.D., prepared a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment.  Dr. Hudspeth concurred with Dr. Tin's April 18, 2013 opinions and assessment.  R. 76-77, 80-81.

On October 22, 2013 state agency physician Dr. George Andrews, M.D., prepared a Physical Residual Functional Assessment.  R. 77-79.  Dr. Andrews opined that Johnson could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  Dr. Andrews also opined that Johnson should avoid concentrated exposures to hazards.  R. 78-79.

On April 2, 2014, Johnson saw nephrologist Dr. Lawrence Smith, M.D.  R. 988-90.  Johnson reported that she had no recurrence of symptoms of gross hematuria or flank pain over the past 10-year history of kidney stones.  R. 988.  Dr. Smith found controlled preserved kidney function, history of nephrolithiasis.  Dr. Smith told Johnson to return in a year.  R. 990.

On April 10, 2014, Johnson saw state agency psychologist Dr. Michael Trieger, Psy.D., for a psychological evaluation and evaluation of

her mental status.  R. 537-40.  Johnson said she sustained a severe back injury in an automobile accident in 2001.  She said that she had steroidal injections, but the injections were no longer effective.  She said she had heart disease and stents in 2006.  She said her heart was functioning normally.  She also said she had diabetes and recurring kidney stones.  R. 537.

Johnson reported to Dr. Trieger that her depression started with the birth of her daughter 19 years earlier.  She said she participated in counseling and took medication.  She said she has taken antidepressant medication since.  She said she was never hospitalized for psychiatric care.  Her symptoms included irritability, negative attitude, low motivation, apathy, hypersomnia, and frequent memory lapses.  R. 538.  Johnson denied homicidal ideations and admitted to fleeting passive suicidal ideations.  She denied any hallucinations, delusions, or other thought disturbances.  R. 538.

Dr. Trieger's mental status examination showed that Johnson was oriented, and her memory was intact.  Her judgment was sound.  Her verbal reasoning skills were adequate.  Her attention and concentration were focused and sustained over the interview.  During the interview, Johnson had pressured speech, word-finding difficulties, and expressions

of feelings of frustration.  She was assessed with a depressive disorder, not otherwise specified and assigned a Global Assessment of Functioning (GAF) score of 51.  Dr. Trieger R. 539-40.  The GAF score was a measure of a clinician's judgment of an individual's overall level of functioning on a hypothetical continuum of mental health and illness.  American Psychiatric Assn, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev.) (DSM IV-TR), at 32-35.  A GAF score of 51 to 60 indicated either moderate symptoms or any moderate impairment in social, occupational, or school functioning.  DSM IV-TR, at 34.  The American Psychiatric Association no longer recommends use of the GAF score.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013), at 16.

### The First Evidentiary Hearing

On December 3, 2014, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 32-56.  Johnson appeared with her attorney.  Johnson testified at the hearing.[3]  Johnson testified that she was 5 feet 4 inches tall and weighed 250 pounds.  She had a bachelor's degree, was married and lived with her spouse.  A 20-year old child lived with them. The three of them lived in a trailer.  Johnson said that her spouse was

---

[3] Vocational expert Dr. James Lanier, Ph.D., also appeared and testified at the first hearing.  The ALJ considered Johnson's testimony at this hearing in making the March 18, 2018 decision at issue but did not consider Dr. Lanier's testimony from the December 3, 2014 hearing.  The Court, therefore, will only discuss Johnson's testimony from this hearing.

disabled due to "[s]ome mental and neck, chronic – degenerative neck and back issues." R. 38. Her husband drove her to the hearing. Johnson said that she rarely drove, once every couple of months. R. 36-37.

Johnson said that she was not working because of back pain, sciatic nerve leg pain, and diabetes issues. R. 37. Her left leg was constantly tingling or "numbing." R. 47. She did not get relief from the lumbar epidural injections she received. She also said she had received the maximum number she could have for the year. She did not get relief from physical therapy and was scheduled to see an orthopedic surgeon. R. 45. She could sit in a chair for about 30 minutes before she had to move because she became stiff. R. 45. She could walk five or 10 minutes before she needed to stop and rest. R. 47. Johnson did not use an assistive device to walk. R. 48.

Johnson had weakness in her hands after having bilateral carpal tunnel surgery and she dropped things. R. 43. Johnson estimated that the heaviest thing she could lift was her five-pound dog. If she lifted anything like a bag of groceries, she would hurt her back. Lifting would also result with blood in her urine due to her chronic kidney stones. No doctor gave her a specific lifting limitation. They told her to stop when it hurts. R. 44-45.

Johnson had heart problems in the past with five stents put into her heart.  Her doctor ordered a stress test and echocardiogram because seven years passed since her last heart surgery.  R. 44-45.

Johnson was treating her mental health with medication.  R. 37.  The medication did not completely resolve her mental problems.  Johnson had no motivation due to her depression, she stayed in bed "all the time" and cried often.  She had depression for 20 years since her daughter was born.  She had been on medication for her depression for 18 years.  R. 38.

Johnson testified that she had trouble sleeping.  Her back pain and restless legs interfered with her sleep.  Acid reflux and sleep apnea also interfered with her sleep.  She had to sleep with her head propped up due to the acid reflux.  The mask she wore due to sleep apnea made her "crazy."  R. 46.

Johnson could take care of her personal hygiene.  During a typical day she took her medications, checked her blood sugar level, watched television, and slept.  She took naps often because she could not sleep well at night.  She helped do the laundry, but she could not lift laundry baskets, and she rarely cooked because she could not stand for long periods of time.  She washed dishes but had to stop and sit often to relieve her pain from standing.  Her daughter did most of the other housework.  R.

39-40.  Johnson said that she played video games on the computer once in a while, and also spent time on Facebook on her phone.  R. 42-43.

Johnson went grocery shopping once a month.  She said the trips were hard on her back.  She was "done" for a couple of days after her grocery shopping.  She went once a month to a meeting of the American Legion Auxiliary.  R. 41-42.

The First Decision of the ALJ and Subsequent Proceedings

On January 8, 2015, the ALJ issued a decision that Johnson was not disabled.  R. 17-23.  The Appeals Council denied Johnson's request for review.  The ALJ's decision became the decision of the Defendant Commissioner.  R. 6.  Johnson brought her first action for judicial review. The District Court remanded the case pursuant to the joint motion to remand.  The Court directed the ALJ on remand "to further consider the evidence and reassess Plaintiff s residual functional capacity. The ALJ will then reevaluate Plaintiff 's ability to return to her past relevant  work and, if warranted,  perform other jobs in the national economy."  R. 1389.

Proceedings on Remand

On remand, the ALJ secured the opinions of medical experts Dr. Randall O'Brien, M.D., and Dr. Ronald Kendrick, M.D.  Dr. O'Brien

submitted written opinions and Dr. Kendrick testified at a subsequent hearing, discussed below.

On October 22, 2017, Dr. O'Brien completed a Medical Source Statement. R. 1544-49. Dr. O'Brien opined that from the Onset Date to the Date Last Insured Johnson could lift 10 pounds occasionally, sit for two hours at one time, and a total of eight hours in an eight-hour workday, and stand and/or walk for one hour at one time and a total of two hours in an eight-hour workday. Dr. O'Brien gave Johnson's chronic low back pain with radiculopathy as the reason for these limitations. R. 1544-45. Dr. O'Brien opined that Johnson did not need a cane to ambulate. Dr. O'Brien also opined that Johnson could reach overhead occasionally and reach in all other directions frequently with either hand. Dr. O'Brien indicated that Johnson could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; and never climb ladders or scaffolds. Dr. O'Brien noted, "Both knees give way. Claimant exhibited ability for other postural activities on 8-28-13." R. 1546 (internal citations omitted to the August 28, 2013 Functional Disability Assessment (R. 616-28)). Dr. O-Brien further testified that Johnson should never work at unprotected heights and should avoid exposure to loud noise levels. R. 1548. Dr. O'Brien opined that the

limitations he found were first present on July 31, 2012 and would last for 12 consecutive months.  R. 1549.

Dr. O'Brien also completed a form entitled Medical Interrogatory Physical Impairment(s)—Adults.  1551-53.  Dr. O'Brien reviewed Johnson's medical records and opined that there was sufficient objective medical and other evidence to allow him to form opinions about the nature and severity of Johnson's impairments.  Dr. O'Brien opined that Johnson's impairments did not meet or equal any impairment set forth 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing of Impairments (Listing).  Dr. O'Brien stated that Johnson's "chronic low back pain and radiculopathy does not satisfy the criteria in Listing 1.04(A) or 1.04 (C) in the absence of objective physical findings, provocative testing and confirmatory imaging."

### The Second Evidentiary Hearing

On January 24, 2018, the ALJ held a second evidentiary hearing. Medical expert Dr. Kendrick and vocational expert Dr. James Lanier, Ph.D., testified at the second hearing.

Dr. Kendrick testified first.  Dr. Kendrick was a board certified orthopedic surgeon who no longer practiced actively.  He still saw patients at a free clinic.  Counsel for Johnson had no objections to Dr. Kendrick's qualifications to testify as a medical expert.  R. 1303.

Dr. Kendrick reviewed the record in this case.  The ALJ asked Dr. Kendrick to focus on the time from the Onset Date of November 2009 to the date last insured of December 2013.  R. 1304-05.  Dr. Kendrick stated that the records provided sufficient information to form an opinion of Johnson's medical status during that timeframe.  Dr. Kendrick testified that during that time frame, Johnson had diabetes; hypertension; coronary artery disease; obesity; bilateral carpal tunnel release and right trigger finger release surgeries; multilevel disc protrusion in the lumbar region; and no significant stenosis associated with bilateral L5 S1 radiculopathy.  R. 1305, 06.

Dr. Kendrick opined that none of her medically determined physical impairments met or equaled a Listing.  Dr. Kendrick further opined on Johnson's physical functional capacity:

> I would place her someplace between a light and sedentary work profile, lifting 15 pounds occasionally, 10 pounds or less frequently; standing and/or walking for four out of eight hours; sitting for six out of eight.  I think she could do the postural of bending, stooping, kneeling, and crawling only occasionally. She's to stay off of ladders, ropes, and scaffolds, but could do stairs occasionally.  The upper extremities would be affected in the way that she could perform all functional modalities at a frequent level, not continuous.  And I think she should, you know, stay away from unprotected heights and dangerous moving machinery and the like, and not operate any vibrating equipment, either.

R. 1306-07.

On examination by Johnson's counsel, Dr. Kendrick stated that radiculopathy can result in sensory and motor loss, but he did not see any such loss in the record except for Dr. Chapa's observation of some weakness in the left ankle and a positive straight leg test.  R. 1308-09.  Dr. Kendrick agreed that radiculopathy could result in "light pain."  R. 1309.

Dr. Kendrick testified that he did not list Johnson's urinary tract infections or chronic kidney stones as a severe impairment because the instances of infections and passing stones were "usually self-limiting conditions.  They don't last forever."  R. 1309.  Dr. Kendrick agreed that Johnson could not work while she was passing a stone.  R. 1310.

Counsel for Johnson asked Dr. Kendrick about the January 30, 2012 CT abdominal scan that showed narrowing of L4 through L5.  Dr. Kendrick stated that the CT scan showed a narrowing of the intervertebral disc. He said, "That's not a pathway where nerves go out."  R. 1312.  Dr. Kendrick stated that such a finding did not "tell you anything about whether there's stenosis or not"  R. 1312.

Counsel asked Dr. Kendrick about the positive straight leg tests in the record.  Dr. Kendrick responded:

> Well, a straight leg raise by itself, that doesn't mean much. People can have positive straight leg raise one day, and the next day it's gone.  So, you know, there's no evidence that there is continuation of radicular pain going down her leg. If she

was having that, I'm sure she'd have been referred to a neurosurgeon.

R. 1313.  Dr. Kendrick later said, "The positive straight leg raise by itself

doesn't mean much.  It says she has an irritated nerve.  That's all."  R.

1314.  Dr. Kendrick agreed that positive straight leg tests could be

indicative of pain.  R. 1314.  Dr. Kendrick also agreed that obesity could

aggravate Johnson's condition by increasing joint pain.  Dr. Kendrick

opined that even with the pain caused by Johnson's condition she could

function at the level to which he opined.  R. 1316.

Dr. Lanier then testified.  Counsel for Johnson did not object to Dr.

Lanier's qualifications to testify as a vocational expert.  R. 1317.  The ALJ

asked Dr. Lanier to assume the following person:

> Assume the past work activity the same as the claimant's;
> exertional capacity limited to sedentary work; no climbing of
> ladders, ropes, or scaffolds; other postural functions could be
> performed occasionally; need to avoid environmental hazards,
> such as unprotected heights and dangerous machinery; the
> need to be able to alternate between a sitting position and a
> standing position periodically during the day if desired, so that
> again, if desired, one could in the aggregate stand up to four
> hours a day if needed. Obviously sedentary jobs, you can sit
> longer if you want. But in terms of standing, could stand up to
> four hours a day at no more than 30 minute intervals; also
> occasional overhead reaching; all other manipulative
> functioning bilaterally could be performed frequently; also
> limitation to performance of simple, repetitive tasks that would
> involve little or no change in work routine; no interaction with
> the general public; occasional interaction with coworkers and
> supervisors.

R. 1318.  Dr. Lanier opined that such a person could not perform Johnson's past work.  Dr. Lanier opined that if the person described in the hypothetical question had Johnson's age, education, and work experience as of the Date Last Insured December 31, 2013, such a person could have performed the sedentary jobs of addresser, with 15,011 such jobs in the national economy; document preparer, with 66,430 such jobs in the national economy; and callout operator, with 48,287 such jobs in the national economy.  R. 1319.

Dr. Lanier opined that a person could miss one and one-half days of work per month and maintain employment.  Dr. Lanier stated that a person had to be on-task 90 to 95 percent of the workday.  R. 1320.  Dr. Lanier testified that a person who needed a five minute break every 60 minutes could not work.  R. 1321-22.

Johnson did not testify at the second hearing.  The ALJ then concluded the hearing.  R. 1324-25.

THE SECOND DECISION OF THE ALJ

On March 28, 2018, the ALJ rendered the decision at issue in this case.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in the Listing of Impairments, 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th

Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir.

2005).

The ALJ determined that Johnson met her burden at Steps 1 and 2.

Johnson had not engaged in substantial gainful activity form her Onset

Date to her Date Last Insured and she suffered from the severe

impairments of spine disorder with lumbosacral radiculopathy, diabetes,

coronary artery disease, hypertension, nephrolithiasis, status-post carpal

tunnel release, obesity, and affective disorder.  R. 1280.  At Step 3, the ALJ

found that Johnson's impairments or combination of impairments did not

meet or equal any Listing.  R. 1281-82.

At Step 4, the ALJ found that Johnson had the following RFC:

After careful consideration of the entire record, the undersigned
finds that, through the date last insured, the claimant had the
residual functional capacity to perform sedentary work as
defined in 20 CFR 404.1567(a) except she could not climb
ladders, ropes or scaffolds, and she could only occasionally
climb ramps or stairs and occasionally balance, stoop, kneel,
crouch or crawl. She had to avoid hazards, could do occasional
overhead reaching, and perform all other manipulative functions
frequently.  She needed to have the option to alternate
periodically equally between a seated and standing position if
desired at no more than 30 minute intervals. She was limited to
the performance of simple and repetitive tasks involving little or
no change in work routine, with no interaction with the general

public and occasional interaction with coworkers and supervisors.

R. 1282.  The ALJ relied primarily on the opinions of medical experts Drs. O'Brien and Kendrick based on their review of Johnson's relevant medical records to support the physical limitations reflected in the RFC.  The ALJ also relied on the August 2013 functional capacity analysis by physical therapist Cain, the consultative examination of Dr. Chapa, and the records from Dr. Mayer's records indicating that Johnson's coronary artery disease was well controlled.  R. 1282-85.

The ALJ found that the evidence did not show functionally debilitating symptoms from her chronic kidney stones and associated urinary tract infections.  The ALJ relied on Johnson's report to Dr. Smith on April 2, 2014 that she had no recurrence of hematuria or flank pain over the preceding ten years.  The ALJ found this evidence to be consistent with Dr. Kendrick's opinion that the kidney stones and urinary tract infections did not cause a functional limitation.  R. 1285.  The ALJ also considered the impact of Johnson's obesity on her RFC.  The ALJ considered the effect of obesity in formulating the limitations in the RFC.  R. 1285.

The ALJ stated, "Relevant credibility factors fail to support a finding of complete disability prior to the expiration of the date last insured."  R. 1286. The ALJ noted a lack of evidence in the record indicating functionally

debilitating pain.  She did not take pain medication stronger than tramadol.
She did not go to the emergency room for pain.  She did not use a TENS
unit.  The ALJ also found that her Function Reports showed a level of daily
activities that was inconsistent with the functional limitations due to pain to
which she testified at the hearing.  The ALJ also noted that the testimony at
the hearing concerned Johnson's then current condition, not her condition
prior to her Date Last Insured.  R. 1286.

In considering Johnson's mental limitations in the RFC, the ALJ relied
on Dr. Trieger's report and the lack of any treatment beyond medication.
The ALJ also relied on the opinions of Drs. Tin and Hudspeth.  The ALJ
stated that she did not give significant weight to the opinions of agency
physicians.  The ALJ stated with regard to the opinions of state agency
psychologists Drs. Tin and Hudspeth:

> Drs. Tin and Hudspeth opined that the claimant could
> understand, remember and carry out short, simple instructions,
> and perform simple tasks that did not require interaction with
> the general public. . . .  The undersigned notes that to some
> extent the claimant is being afforded the benefit of the doubt
> regarding the extent of her mental functional limitations during
> the period at issue.  As noted above, the record shows that the
> claimant's mental symptoms were largely controlled with
> medications.

R. 1288.

Based on the RFC finding and the opinion of vocational expert Dr. Lanier, the ALJ concluded at Step 4 that Johnson could not perform her prior relevant work.  R. 1288.

At Step 5, the ALJ found that Johnson could perform a significant number of jobs that existed in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 and the opinion of Dr. Lanier that a person with Johnson's age, education, work experience, and RFC could perform the representative jobs of addresser, document preparer, and call out operator.  R. 1289.  The ALJ concluded that Johnson was not disabled by her Date Last Insured.  R. 1289. Johnson then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, as amended, 2017 WL 5180304, at *2 (October 25, 2017)

(original version published March 16, 2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

    The decision of the ALJ is supported by substantial evidence.  The

RFC determination is supported by the opinions of Drs. O'Brien and

Kendrick, the examination by Dr. Chapa, and the functional capacity

assessment of physical therapist Cain.   The RFC determination is also

supported by the medical records showing that Johnson's heart condition

was well controlled from the Onset Date to the Date Last Insured and the

December 17, 2009 MRI that showed mild to moderate degenerative disc

disease.  The non-exertional mental limitations in the RFC are also

supported by the opinions of Drs. Tin and Hudspeth, as well as the

evidence that Johnson's mental impairment was treated with medication.

The RFC, combined with the Medical-Vocational Guidelines and the

testimony of vocational expert Dr. Lanier, supports the finding at Step 5 that

Johnson could perform a significant number of jobs in the national

economy.  The decision was supported by substantial evidence.

Johnson argues that the mental limitations in the RFC were not

supported by substantial evidence.  The Court disagrees.  The opinions of

Drs. Tin and Hudspeth supported those findings.  Johnson argues that

those opinions were not given significant weight.  The Court disagrees.

The ALJ said that "the opinions of the State Agency physicians were not

given significant weight."  R. 1288.  The ALJ was talking about physicians

Drs. Madala and Andrews.  Drs. Tin and Hudspeth are not physicians; they

are psychologists.  After discussing the weight given to the state agency

physician opinions, the ALJ recited the opinions of psychologists Drs. Tin

and Hudspeth.  The ALJ stated that he gave Johnson "the benefit of the

doubt" by including limitations in these opinions in the RFC because her

"mental symptoms were largely controlled by medication."  R. 1288.  The

ALJ sufficiently explained his treatment of the opinions of Drs. Tin and

Husdpeth.  Those opinions provided substantial evidence for the portions of the RFC that reflected Johnson's mental impairments.

Johnson criticizes the ALJ's consideration of Johnson's urinary tract impairments and her obesity.  Johnson correctly states, however, that the ALJ relied on Dr. Kendrick's opinions to reach his conclusions regarding the effect of Johnson's kidney stones and urinary tract infections.  See Plaintiff's Memorandum in Support of Her Motion for Summary Judgment or Remand, at 6; R. 1281, 1885-86.  Dr. Kendrick's opinions provide substantial evidence to support these aspects of the ALJ's decisions regarding Johnson's kidney stone and urinary problems.  Johnson's arguments to the contrary are not persuasive.

Johnson attacks the opinions of Dr. Kendrick.  Johnson asks this Court to reweigh the value of Dr. Kendrick's testimony.  The Court may not reweigh the evidence.  See Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82.  The ALJ was entitled to rely on the opinions of medical experts such as Dr. Kendrick.  The Court will not reweigh this evidence.

Johnson argues that the ALJ erred in his consideration of Johnson's statements about the limiting effect of her symptoms.  The Court agrees that the ALJ erred when he stated that he considered "relevant credibility factors" in assessing Johnson's statements about her symptoms.  R. 1286.

The Social Security Administration has instructed ALJs not to use the word "credibility."  SSR 16-3p, as amended, 2017 WL 5180304, at *2 (October 25, 2017) (original version published March 16, 2016).  The ALJ's use of that word "credibility" was error.

The Court finds that the use of the word "credibility" was harmless in this case.  The Social Security Administration removed the word "credibility" from its decisions because factfinders, such as the ALJ, were directed not to attempt to assess the claimant's character or truthfulness. Rather, ALJs were directed to consider whether the claimant's subjective symptoms were consistent with the other evidence in the record:

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . . .

 SSR 16-3p, 2017 WL 5180304, at *11 (emphasis added).

The ALJ here did not attempt to assess Johnson's character or truthfulness.  Rather the ALJ considered whether Johnson's statements

were consistent with other evidence in the record.  ALJs are directed to

evaluate a claimant's statements in light of the other evidence, including:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3P, 2017 WL 5180304, at *7-*8.  The ALJ used these factors in

assessing Johnson's statements of the limiting effects of her symptoms in

light of the other evidence in the record.  The ALJ considered the strength

of Johnson's pain medication; Johnson's treatment records showing a lack

of emergency room visits and a lack of a prescription for a TENS unit for

pain; her medical records showing her lack of muscle atrophy; and her daily

activities.

In addition, the ALJ relied on the fact that Johnson testified as to her condition in December 2014 at the time of the first hearing; she did not testify about the effect of her symptoms during the relevant period from her Onset Date in 2009 until her Date Last Insured of December 31, 2013.  R. 1286 ("It should be noted that most of the testimony elicited from the claimant . . . focused only on her alleged current functioning, rather than her functioning during the time at issue.").  R. 1286.  An ALJ may discount the probative value of evidence of the claimant's condition significantly after the date last insured.  See McHenry v. Berryhill, 911 F.3d 866, 873 (7th Cir. 2018); Eichstadt v. Astrue, 534 F.3d 663, 667 (7th Cir. 2008).  In light of the fact that the ALJ used the factors called for in SSR 16-3p and did not attempt to assess Johnson's character or truthfulness, and also that the ALJ properly considered the untimeliness of Johnson's testimony about her symptoms, the Court finds that the ALJ's analysis was supported by substantial evidence and his incorrect use of the word "credibility" was harmless. See Pepper v. Colvin, 712 F.3d 351, 366 (7th Cir. 2013); Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989).

Johnson criticizes the ALJ consideration of the factors in SSR 16-3p in assessing the weight to be given to her statements of the limiting effect of her pain.  The ALJ was following the instructions in SSR 16-3p; the ALJ

did not err in doing so.  The ALJ also did not equate Johnson's daily activities with an ability to perform work functions.  The ALJ considered her daily activities in the context of evaluating her statements of the limiting effect of her pain.   The ALJ is instructed by SSR 16-3 to consider daily activity in evaluating claimants' statements of the effect of symptoms.  The ALJ did not improperly equate Johnson's daily activities with the ability to perform substantial gainful activity.  The ALJ properly  considered all the evidence in the record, including her daily activities, the medical records, medical expert opinion evidence, and the other evidence presented in making his RFC analysis and in making his decision.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 21) should be ALLOWED, Plaintiff Cecelia Ann Johnson's Motion for Summary Judgment or Remand (d/e 18) should be DENIED, and the decision of the Defendant Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video

Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   December 27, 2019


_____s/ *Tom Schanzle-Haskins*_____

TOM SCHANZLE-HASKINS

UNITED STATES MAGISTRATE JUDGE